32234. PENDLETON *et al. v.* NEWTON.

DECIDED DECEMBER 3, 1948.

*Nathan Jolles,* for plaintiffs.

*Bussey & Hardin, Henry J. Heffernan,* for defendant.

FELTON, J. The evidence for the plaintiffs was as follows: Leon Barton testified: "The marble mantels in Mr. Pendleton's Building at 916 Greene Street were nice marble mantels, one was black and he believes there were about three of these mantels.

They were more valuable than the ordinary mantel. He sells mantels for $125 to $250 according to the carving or the cut of them and the nature of the marble. These could have been Italian marble. A nice Italian marble mantel is valued at $250. They were nice marble mantels but he could not describe them as to design or whether or not they were broken or chipped. If so, they would not be as valuable as ones that were complete. He did not remember whether or not they were broken or cracked. They have sold mantels for $50 and even less."

L. C. Daniels testified as follows: "He did not see the marble mantels after they were taken down on the first floor and he never did see them any more; that when he saw them they were all up and in perfect shape so far as he could tell. They were mantels, but he did not know whether they were Italian marble mantels or not. He really did not know the value of marble mantels, and he told Mr. Pendleton that he thought he could get $50 for them. He did not know whether they were worth more or less, the best he rememberd there were about four of them."

Franklin McCabe testified for the plaintiff: "He did work on the Pendleton Building and he helped take the mantels down to the basement, they were in good shape considering how old the house was. They were not broken, nothing but the hearth; one of the mantels was black and one pinkish and one had a circular head on it and two of them had a raised panel on a circle. That he took the mantels down and placed them in the basement and laid them out in full size in one corner in the back of the basement. The basement was cut off in two or three apartments and they picked out one that one would not need to go in when in the basement, until the building was completed. The electricians came there and started running conduit in the basement up to the new part under the old building, and they decided to put the panel boards right at the back end and another little room just back of where they had stored the mantels. They set up the material and handrails and pickets, right in the corner where the mantels were. When they came and started they set up, the electricians he was speaking of, a big three-legged vice on the stand. They put the vice right in between the four man-

tels, which was not but about four feet space, and they stood on the mantels, laid the piping for the conduit. It was dark down there and it had been going on some two or three weeks and it was too late to do anything after they found them working like they were. The mantels were first discovered broken when a lady came down to look at them who wanted to buy them, and when he went down to get them he found them in pieces and had to tell the lady that he could not get enough together to show to her. This was the first that he knew that they were broken because they were not in that condition when brought down there. The electrician doing the electric work was Mr. Newton. He had two men there to start with and he was foreman on this job and he was in charge of the whole thing and helped to take the mantels down and knew who was to do the work in that building. There were about three carpenters, two laborers, and two electricians. Later on there were brickmasons on the job. Levy Daniel helped take down the mantels. No one had occasion to use that three-legged vice but the electricians."

Breault C. Pendleton, the plaintiff, testified as follows: "He and his wife own this property and own the mantels. There were about thirteen mantels all together and some were in such bad condition that we could not take them out and resell, but four of the most valuable ones were in perfect condition and they took them down with the expectation of selling them. These four particular mantels were taken down very carefully and laid in the basement. Two of these mantels were kind of pink marble and two of them were black marble, and all in very good condition when stored in the basement. The hearth part was not, but the mantel part was in good condition. These mantels were worth $250 apiece when stored in the basement with the expectation of reselling them. In April when the remodeling of the building first started, the first thing he did was to establish a dark room for photographic work, and at that time they had quite a lot of plumbing and also had Mr. Newton to do the electric wiring. At that time, however, that was all finished but the mantels were taken in the basement. There was no work done in that part of the building outside of the first part

of the contract until the main wiring was started in the new part, and there were no other workmen using that basement. The brick work was all on the front and the brickmasons and everybody kept their business out of the building. The electricians set up one of those three-legged vices for threading pipe in the basement. It was a heavy iron instrument, and, as well as he remembered, the instrument had one of these round disks for threading pipe, two or three handles that you turn, and anyway everytime they would cut a pipe and thread a pipe they would throw it down and every time they did, that broke off another piece of the marble, and he did not know they were in that condition until he got them out to sell. The plumbers were down in the basement during the first part of the program to put in the plumbing for the studio, but the mantels had not been moved down in the basement at that time, and the next time they were there the mantels were broken. The carpenters kept their tools on the second floor. There wasn't any use of their going down there. He did not watch everybody. The plumbers were not even on the job at the time of the breaking of the mantels. The Newton Electric Company stayed on the job about a week, and then they came back and had to run some special conduit to the new building as it went up, and then they had to put in this large conduit down in the basement and it runs to the different apartments. The buildings were all on separate meters and each one had to have a line run to it. The machine that Mr. McCabe described was used for this purpose."

The evidence relied upon by the plaintiffs was wholly circumstantial on the questions of whether employees of the defendant damaged the mantels and whether the damage resulted from negligence. Much of the testimony is pure conjecture and must be discarded entirely. Not only does the evidence leave open the possibility that other workmen damaged the mantels but, assuming that they did damage the mantels, it is not shown that the damage was done under such circumstances and conditions that it could be said with any degree of certainty that it was negligently done. We do not think that the evidence authorized a verdict for the plaintiffs, but a verdict for the defendant was demanded. It is, therefore, unnecessary to pass on either of the

other assignments of error, one involving the qualification of the jury and one involving the correctness of the court's charge.

The court did not err in overruling the motion for a new trial. *Judgment affirmed. Sutton, C. J., and Parker, J., concur.*